# Exhibit D

AGREEMENT DATED JUNE 9, 1981

BETWEEN

AB VOLVO

AND

WHITE MOTOR CORPORATION,
GEMINI MANUFACTURING CO.
AND WHITE MOTOR INTERNATIONAL, INC.

TABLE OF CONTENTS

| Article | | Page |
|---------|---|------|
| I | ASSETS TO BE PURCHASED | 1 |
| II | CURRENT ASSETS AND LIABILITIES | 7 |
| III | PURCHASE PRICE | 10 |
| IV | THE CLOSING | 12 |
| V | FINAL COMPUTATION OF THE PURCHASE PRICE | 17 |
| VI | WARRANTIES AND REPRESENTATIONS OF WHITE | 23 |
| VII | WARRANTIES AND REPRESENTATIONS AB VOLVO | 31 |
| VIII | CONDITONS PRECEDENT TO THE OBLIGATIONS OF VOLVO AND AB VOLVO | 32 |
| IX | CONDITONS PRECEDENT TO THE OBLIGATIONS OF WHITE | 36 |
| X | COVENANTS OF WHITE MOTOR CORPORATION | 37 |
| XI | COVENANTS OF AB VOLVO AND VOLVO | 38 |
| XII | ADDITIONAL AGREEMENTS OF WHITE | 40 |
| XIII | RESTRUCTURING OF WHITE'S OPERATIONS | 42 |
| XIV | ADDITIONAL AGREEMENTS OF VOLVO | 42 |
| XV | INDEMNIFICATION | 45 |
| XIV | VOLVO'S RIGHT TO MATCH OFFERS | 45 |
| XVII | MISCELLANEOUS PROVISIONS | 46 |

PURCHASE AGREEMENT

June 9, 1981

White Motor Corporation
34500 Grand River Avenue
Farmington Hills, Michigan  48024

Dear Sirs:

This is to set forth the terms on which a wholly owned subsidary ("Volvo") of AB Volvo, a Swedish corporation, will acquire certain assets from White Motor Corporation ("White Motor"), an Ohio corporation, Gemini Manufacturing Co. ("Gemini"), an Ohio corporation, and White Motor International, Inc. ("WMI"), a Delaware corporation (White Motor, Gemini and WMI being together "White"), which terms are as follows:

I

ASSETS TO BE PURCHASED

1.01.  Volvo will purchase from White, and White will sell to Volvo, on the terms set forth below, the following assets (the "Purchased Assets"):

(a)    The land and buildings (the "New River Valley Property") near Dublin, Virginia described in Exhibit 1.01A.

(b)    All White's rights under three subleases (the "Orrville Leases") dated August 1, 1977 between Gemini and The Allen Group, Inc. relating

to a manufacturing facility at Orrville, Ohio.

(c)     All White's rights under a purchase agreement (the "Ogden Purchase Agreement") dated June 1, 1974 between White Motor and the City of Ogden, Weber County, Utah, and all White's other rights with regard to the land and buildings (the "Ogden Property") in Ogden, Utah described in Exhibit 1.01C.

(d)     The parcels of land and buildings described in Exhibit 1.01D, except parcels which Volvo informs White by June 30, 1981 that Volvo does not wish to acquire.

(e)     All White's rights under the leases of real property described in Exhibit 1.01E, except leases which Volvo informs White by June 30, 1981 that Volvo does not wish to acquire.

(f)     All equipment, presses and tools owned by White and used at, or in connection with, (i) the three production facilities (the "Truck Production Facilities") on the two properties described in subparagraphs (a) and (c) and on the property which is the subject of the Orrville Leases or (ii) the facilities (the "Additional Truck Facilities") on the properties described in subparagraph (d) or which are the subject of the leases described in subparagraph (e).

(g)     All White's rights under leases or otherwise (including, but not limited to, White's rights under the Ogden Purchase Agreement and under an agreement dated as of January 26, 1981 among White Motor, Gemini and 103099 Canada, Inc.) to use equipment, presses and tools used by it at, or in connection with, the Truck Production Facilities or the Additional Truck Facilities.

2

(h)     White's entire inventory (the "New Truck Inventory") at the Closing Date (as defined in Paragraph 4.01) of finished new White, Autocar and Western Star trucks, other than trucks ("Finished Trucks in Transit") on which all assembly plant production by White has been completed and which have left White's truck production facilities and have been designated for specific customers pursuant to those customers' orders.

(i)     All 1981 model year new White, Autocar and Western Star trucks returned by dealers within 120 days after the Closing Date under provisions of the dealer agreements between White and those dealers which permit dealers to return trucks purchased within six months before the agreement terminates.

(j)     White's entire inventory at the Closing Date of used trucks.

(k)     White's entire inventory at the Closing Date of production materials, work in process, components and supplies located at the Truck Production Facilities or the Additional Truck Facilities or consigned by White as consignor.

(l)     White's entire inventory at the Closing Date of spare truck parts, including, but not limited to, spare truck parts at White's facility (the "79th Street Facility") at East 79th Street in Cleveland, Ohio.

(m)     All White's interests as owner or lessee (other than White's rights as lessee under leases which Volvo notifies White by June 30, 1981 that Volvo does not wish to assume) of all other assets owned or leased by White which are used by White in its operations at the Truck Production Facilities and the Additional Truck Facilities.

3

(n)   All White's rights in or to trademarks, service marks, trade names, franchises and similar rights owned or possessed by White relating to White or Autocar trucks.

(o)   All White's rights to produce or distribute Western Star trucks and all other rights owned or possessed by White with regard to Western Star trucks.

(p)   All White's rights in or to patents, designs, drawings, tooling and similar items (the "White and Autocar Design Items") owned or possessed by White and used in the production of White or Autocar trucks.

(q)   All White's interests as owner or lessee (other than White's interests as lessee under leases which Volvo informs White by June 30, 1981 that Volvo does not wish to assume) of computers, computer peripheral equipment, computer systems (including management information systems), accounting systems and operating procedures owned or leased by White which are used by White in connection with the production, distribution and servicing of White, Autocar or Western Star trucks or used trucks, other than computer and accounting systems and operating procedures used by White Motor Credit Corporation and White Motor Credit Corporation of Canada, Limited (together "WMCC") and items described in Paragraph 1.02(h).

(r)   All sales records and other records and memorabilia relating directly to production, distribution or servicing of White, Autocar or Western Star trucks or used trucks.

4

(s)     All other contracts and leases, other than dealer and foreign distributor agreements, and other than contracts and leases which Volvo informs White by June 30, 1981 that Volvo does not wish to assume, which are in effect on the Closing Date and which relate to White, Autocar or Western Star trucks, or used trucks, to their production, distribution or servicing, or to parts, production materials or components for those trucks. Volvo agrees that, without limiting its powers to specify as to other contracts and leases, those contracts and leases listed on Exhibit 1.01S will not be specified as ones Volvo does not wish to assume.

(t)     All White's interests in assets acquired in connection with the restructuring program described in Paragraph 13.01.

(u)     All White's interests as owner, lessee (other than White's interests as lessee under leases which Volvo informs White by June 30, 1981 that Volvo does not wish to assume) or otherwise in all other items, including returnable containers, (other than current assets and items specifically excluded elsewhere in this Agreement) used by White in connection with the production, distribution or servicing of White, Autocar or Western Star trucks or used trucks (including, but not limited to, testing equipment located at Wickliffe, Ohio).

1.02.  The Purchased Assets will not include:

(a)     Contracts and leases relating to the 79th Street Facility or White's Farmington Hills, Michigan facility.

(b)     Contracts with third parties, including WMCC, for providing financing to purchasers of trucks at wholesale or retail.

5

(c)     Any land, buildings or other assets of White (other than inventory and assets specifically listed in Paragraph 1.01) located at the 79th Street Facility or at any of the facilities described in Paragraph 12.01 which are not included in the Purchased Assets.

(d)     A note receivable or other proceeds or claims arising from the sale of White's Australian operations.

(e)     Rights to receive payments, as creditor or stockholder, upon liquidation of White's Canadian subsidiary.

(f)     Land, buildings and equipment located in Roseville, Minnesota and in Nashville, Tennessee presently leased to third parties.

(g)     Front axle tooling, and any other equipment, presses and tools, located at the 79th Street Facility.

(h)     Assets, contracts, leases and other items primarily used by WMCC which either (i) are not material to White in connection with the production, distribution or servicing of trucks, or (ii) can be readily replaced by Volvo without significant cost.

(i)     Equipment, presses and tools used by White primarily in connection with its efforts (i) to manufacture trucks for military use, or (ii) to manufacture truck engines.

(j)     Capital stock of any subsidiaries of White.

(k)     Any assets of White which are not related to the production, distribution or servicing of White, Autocar or Western Star trucks or used trucks.

(l)     Any pension plans of White.

6

II

## CURRENT ASSETS AND LIABILITIES

2.01.  Volvo will, at the request of White, purchase from White any of White's current assets, as defined in accordance with generally accepted accounting principles, other than cash and cash equivalents, and other than prepaid taxes (except as provided in Paragraph 5.04(c)) and other prepaid items or deferred charges from which Volvo cannot obtain benefit, which are not included as Purchased Assets and which (a) relate to the production, distribution or servicing of trucks (including accounts receivable and deposits with suppliers), and (b) White designates to Volvo at least 30 days prior to the Closing Date (the "Purchased Current Assets").  If White so elects in the designation to Volvo, White may include in accounts receivable to be purchased by Volvo sums which will be owed to White upon transfer of title to Finished Trucks in Transit.

2.02.  Volvo will assume (a) White's express warranty obligations and legally enforceable implied warranty obligations to repair or replace components of trucks sold by White ("Legal Warranties"), whether arising prior or subsequent to the Closing Date, with regard to White, Autocar, Western Star and used trucks (including obligations, if any, which could have been disaffirmed by White in the proceedings (the "White Chapter II Proceeding") under Chapter II of the Bankruptcy Code relating to White Motor and Gemini pending in the United States Bankruptcy Court for the Northern District of Ohio), (b) any obligations of White, whether arising prior or subsequent to the Closing Date, to repair or replace any components in White, Autocar or Western Star trucks because of any order or direction of a government agency ("Government Recalls"), (c) any obligations of White, in addition

7

to Legal Warranties, to repair or replace components of trucks sold by White as part of a policy initiated by White on or before the Closing Date, which is applicable to all trucks of a particular model built or sold within a specified time period ("White Policy Recalls"), (d) any obligations of White to repair or replace components of trucks sold by White pursuant to written notice given to specific customers on or before the Closing Date, representing individual customer adjustments ("Individual Policy Adjustments") and (e) any other current liabilities, as is defined in accordance with generally accepted accounting principles ("Assumed Current Liabilities") of White, other than obligations to pay taxes, incurred by White since commencement of the White Chapter 11 Proceeding in connection with the production, distribution or servicing of trucks, which White designates to Volvo at least 30 days prior to the Closing Date.  Volvo will not under any circumstances assume any liabilities of White (i) for personal injury or property damage because of alleged negligence or breach of warranty, or under any other theory of product liability or (ii) to pay damages (other than the purchase price of goods or services provided to White) by reason of any breach of any obligations or any other acts or omissions of White.

2.03.  Designations of current assets and current liabilities referred to in Paragraph 2.01 and clause (e) of Paragraph 2.02 may be by type (such as "accounts receivable"), without specification of amount.

2.04.  If the Purchased Current Assets include accounts receivable, on the earlier of 210 days after the Closing Date or the day the Note (as that term is defined in Paragraph 5.04) is issued (the "Accounts Receivable Settlement Date") White will repurchase from Volvo all those accounts receivable which have not been collected by Volvo.  The repurchase price will be the amount of the repurchased

8

accounts receivable, less all reserves for doubtful collections, shown on White's books as of the Closing Date and used in calculating the purchase price of the Purchased Current Assets (after reduction of the reserves as provided below), and will be paid by reduction, as of the Accounts Receivable Settlement Date, of the principal amount of the Temporary Note (as that term is defined in Paragraph 4.03). To the extent that a customer, who was a customer of White prior to the Closing Date and of Volvo after the Closing Date, makes payments after the Closing Date, all the payments shall be first applied to the oldest accounts receivable outstanding from the customer, unless, as a result of a dispute between a customer and White, other specific application is designated by the customer at the time of making a payment. If by the Accounts Receivable Settlement Date, the amount collected by Volvo on account of accounts receivable included in the Purchased Current Assets exceeds the purchase price paid by Volvo for the accounts receivable included in the Purchased Current Assets plus interest or penalties on those accounts receivable in accordance with their terms which accrue after the Closing Date and are collected by Volvo, Volvo shall, on the Accounts Receivable Settlement Date, remit the excess to White and also reassign to White all those accounts receivable which at the time have not been collected by Volvo. At the time of any repurchase or reassignment of accounts receivable by Volvo to White pursuant to this subparagraph, Volvo shall also turn over to White all supporting data relating to those accounts so that White may effectively pursue its collection rights and remedies with respect to those accounts. If before the Accounts Receivable Settlement Date White informs Volvo that White wants to repurchase accounts receivable from account debtors who, Volvo has reported to White, have informed Volvo that they do not intend to pay their accounts, Volvo will assign

9

those accounts to White and the reserve for doubtful accounts used in computing the repurchase price of accounts receivable to be repurchased on the Accounts Receivable Settlement Date will be reduced by the amount of the accounts receivable assigned to White in accordance with this sentence.

2.05. If the amount of the payments Volvo makes with regard to the Assumed Current Liabilities exceeds the total amount of the Assumed Current Liabilities shown on the Closing Date Statement, as that term is defined in Paragraph 5.03, as Volvo makes payments of the excess amounts, White will reimburse Volvo for the amount of those payments. Any reimbursement to which Volvo is entitled while the Temporary Note is outstanding will be by reduction of the principal amount of the Temporary Note. Volvo will notify White at least monthly of the amount of any payments of Assumed Current Liabilities Volvo makes in excess of the total amount shown on the Closing Date Statement, reductions of the principal amount of the Temporary Note will be effective when applicable notices are given and reimbursement after the Temporary Note is no longer outstanding will be made by White promptly after each notice is given.

III

PURCHASE PRICE

3.01. The purchase price Volvo will pay for the Purchased Assets will be (a) the book value of the Purchased Assets, net of reserves, shown on the Closing Date Statement, plus (b) the value (determined as set forth in Paragraph 5.02(b)) of any supplies included in the Purchased Assets which are not included under clause (a), minus (c) any amounts carried by White on its books on the Closing Date as the asset value (net of accumulated amortization) of capital leases

10

included in the Purchased Assets, and minus (d) the principal of, and accrued but unpaid interest at the Closing Date on, any indebtedness secured by mortgages on, or security interests in, Purchased Assets (other than indebtedness (i) with respect to capital leases or (ii) the non-payment of which will, by reason of orders in the White Chapter II Proceeding, not adversely affect Volvo's rights to use the Purchased Assets securing the indebtedness or to transfer those Purchased Assets free and clear of any liens or encumbrances), and minus (e) $500,000 to reimburse Volvo for costs in excess of normal pension costs which Volvo may incur in providing pensions to White employees who become Volvo employees, and minus (f) an amount equal to White's reserves shown on the Closing Date Statement for Legal Warranties, Government Recalls, White Policy Recalls, Individual Policy Adjustment and any other recalls with regard to trucks sold by White prior to the Closing Date, and minus (g) $58 million.

3.02.   Volvo will pay, or receive credit for, an amount equal to (i) the amount of the Purchased Current Assets, net of reserves for doubtful accounts (if the Purchased Current Assets include accounts receivable) and any other applicable asset reserves shown on the Closing Date Statement, minus (ii) the amount of the Assumed Current Liabilities shown on the Closing Date Statement.

3.03.   For the purposes of Paragraphs 3.01 and 5.01, White's reserves for Legal Warranties, Government Recalls, White Policy Recalls, Individual Policy Adjustments and any other recalls will be calculated as follows:

(a)    As to Legal Warranties, in a manner consistent with that used by White in preparing the financial statements included in the Report on Form 10-K for the year ended December 31, 1979 ("White's 1979 10-K") filed by White with the Securities and Exchange Commission.

11

(b)   As to Government and White Policy Recalls with respect to which notice of recall has been given prior to the Closing Date, in a manner consistent with that used by White in preparing the financial statements included in White's 1979 10-K.

(c)   As to Individual Policy Adjustments with respect to which White has given written notice to the customer prior to the Closing Date, in a manner consistent with that used by White in preparing the financial statements included in White's 1979 10-K.

(d)   As to any other recalls, the sum of $1,000,000.

IV

THE CLOSING

4.01.  The "Closing Date" will be the later of (a) 20 days after Volvo receives the Estimated Statement (as that term is defined in Paragraph 4.03), (b) the day following the day on which the order (the "Order") in the White Chapter II Proceeding approving this Agreement and the transaction contemplated by it is entered, (c) the day following the expiration of all waiting periods required under the Antitrust Improvements Act or (d) August 15, 1981.

4.02.  The closing of the transaction contemplated by this Agreement (the "Closing") will take place at the offices of Rogers & Wells, 200 Park Avenue, New York, New York, at 11 o'clock A.M., New York time on the Closing Date, except that if the Closing Date is a day on which banks are closed in the State of New York or in Sweden, the Closing will take place on the next following day which is not a day on which banks are closed in New York or in Sweden. Regardless of when the Closing takes place, all documents will be dated the Closing Date,

12

and the Closing will be deemed to have taken place at 11:59 P.M. local time on the Closing Date (except that risk of loss of Purchased Assets will be transferred at the actual time the Closing is completed).

4.03.   At the Closing, Volvo will deliver to White Motor the following:

(a)   Certified or bank cashier's checks drawn on a bank or banks which are members of the New York Clearing House Association, in an amount equal to (i) one-third of the estimated purchase price of the Purchased Assets, plus or minus (ii) the estimated sum due from, or credit due to, Volvo under Paragraph 3.02, and plus (iii) the estimated sum Volvo is required to pay to White under Paragraph 13.01.

(b)   A note (the "Temporary Note") substantially in the form of Exhibit 4.03B in a principal amount equal to two-thirds of the estimated purchase price of the Purchased Assets and a guaranty by AB Volvo of the Temporary Note and the Note substantially in the form of Exhibit 4.03B-1.

(c)   Assumption agreements and such other documents as White may reasonably request by which Volvo assumes (and AB Volvo guarantees performance by Volvo under such assumption) all White's obligations under any leases or contracts included in the Purchased Assets.

(d)   An agreement substantially in the form of Exhibit 4.03D by which Volvo agrees to indemnify White against any costs or liabilities by reason of Volvo's failure to fulfill any obligations (i) relating to periods after the Closing Date, under any leases or contracts included in the Purchased Assets, (ii) under any mortgages, security agreements or other agreements related to indebtedness secured by Purchased Assets for which

13

Volvo receives credit in the computation of the purchase price of the Purchased Assets, or (iii) assumed by Volvo in clause (a), (b), (c) or (d) of Paragraph 2.02.

(e)  A document substantially in the form of Exhibit 4.03E by which Volvo assumes and agrees to pay all the Assumed Current Liabilities.

(f)  A copy, executed by Volvo, of an agreement (the "Mutual Access Agreement") substantially in the form of Exhibit 4.03F by which Volvo, White and WMCC agree to give each other access during normal business hours to credit and similar information necessary to their respective businesses.

(g)  Releases running to White from parties to contracts or leases assumed or replaced by Volvo, or which are the subject of indemnification under subparagraph (d), releasing White from its obligations which are assumed or replaced by Volvo, to the extent Volvo is able to obtain those releases with reasonable effort (which will include offering to become directly liable to the other party for the obligations Volvo assumes), but without Volvo's making any payments for the releases.

(h)  Copies of any releases from dealers of the type described in Paragraph 11.04 which Volvo has obtained.

For the purpose of this paragraph 4.03, the estimated purchase price of the Purchased Assets and other estimated amounts will be the sums which would have been on the Closing Date Statement if the Closing Date Statement were derived from the balance sheet of White at the end of the third month preceding the month in which the Closing Date falls, adjusted to take account of additional depreciation and amortization during the month in which the Closing

14

Date falls and the two preceding months, except that if White believes the Closing Date Statement will differ in any material respect, in addition to additional depreciation and amortization, from the statement derived from the balance sheet at the end of the third preceding month, White will notify Volvo at least 20 days before the Closing Date of that fact and of the estimated amount of the differences, and the estimated purchase price of the Purchased Assets will be adjusted to take account of the anticipated differences. The statement derived from the balance sheet at the end of the third preceding month, as adjusted, is the "Estimated Statement."

4.04. At the closing, White will deliver to Volvo the following:

(a)    Deeds to all real property owned by White which is included in the Purchased Assets, in proper form for recording in the appropriate recording offices.

(b)    Documents, substantially in the form of Exhibit 4.04B (modified to the extent required to make the documents effective under local law and, where applicable, to enable them to be recorded in the appropriate recording offices) by which White assigns to Volvo all White's rights under all leases by which White holds the leased assets included in the Purchased Assets.

(c)    A document assigning to Volvo all White's rights under the Ogden Purchase Agreement.

(d)    A Bill of Sale relating to all the personal property included in the Purchased Assets.

(e)    Documents assigning to Volvo all White's rights in or to trademarks, trade names, service marks and franchises included in the

15

Purchased Assets, in proper form for filing or recording in the United States Patent Office or (if and to the extent the documents are prepared by Volvo at its expense) any other offices in which those documents are required to be filed or recorded or in which Volvo reasonably believes it is advisable that those documents be filed or recorded.

(f)    Documents assigning to Volvo all White's rights in or to the White and Autocar Design Items.  Any documents assigning patents will be in proper form for filing or recording in the United States Patent Office or (if and to the extent the documents are prepared by Volvo at its expense) any other offices in which those documents are required to be filed or recorded or in which Volvo reasonably believes it is advisable that those documents be filed or recorded.

(g)    Manufacturer's statements of origin relating to all trucks in the New Truck Inventory and documents of transfer relating to all other trucks included in the Purchased Assets (which manufacturer's statements of origin and documents of transfer will be delivered at locations agreed to by Volvo).

(h)    All other documents of assignment, financing statements and other documents which Volvo reasonably requests to carry out the transfer of the Purchased Assets from White to Volvo.

(i)    All documents of assignment, financing statements and other documents which Volvo reasonably requests to transfer to Volvo the Purchased Current Assets.

(j)    A copy, executed by White and WMCC, of the Mutual Access Agreement.

(k)    A certified copy of the Order.

16

V

FINAL COMPUTATION OF THE PURCHASE PRICE

    5.01   Within 180 days after the Closing, White will deliver to Volvo a statement as of the Closing Date of assets purchased and liabilities assumed by Volvo and other items taken into account in determining the purchase price for the Purchased Assets, as set forth in Paragraph 3.01, and in determining the amount Volvo is to pay, or for which it is to receive credit, under Paragraph 3.02 (the "Initial Closing Date Statement") reported upon in the manner described in Paragraph 5.02 by Ernst & Whinney, or other accountants consented to by Volvo ("White's Accountants").   Except as expressly provided elsewhere in this Agreement, the Initial Closing Date Statement will be prepared using the same accounting principles, to the extent applicable, used in preparing the consolidated financial statements of White Motor and its subsidiaries included in White's 1979 10-K, applied consistently, with reserves for depreciation and doubtful accounts, and other applicable asset reserves, calculated in the same manner as they were calculated in preparing the financial statements included in White's 1979 10-K, except that (a) the reserve for obsolescence relating to trucks, spare truck parts and production materials and components will be equal in total to (i) 25% of the cost of all saleable new trucks which were in inventory, and not the subject of bona fide customer orders at the Closing Date, which were produced in the model year 1980, plus (ii) 50% of the cost of all saleable new trucks which were in inventory, and not the subject of bona fide customer orders, at the Closing Date, which were produced in the model year 1979, plus (iii) the sum, if any, required to reduce the value at which saleable used trucks are carried to their aggregate

17

market value, plus (iv) 100% of the cost of all new and used trucks which are not saleable, plus (v) the value of any saleable spare truck parts in inventory at the Closing Date in excess, as to any type of part, of the estimated amount which will be needed to meet demand during the four years beginning on the Closing Date (estimated on the basis of White's annualized sales volume, based on actual sales volume for the period from September 1, 1979 through July 31, 1980, adjusted to take account of effects of engineering changes or product changes in spare truck parts, truck components and similar items), plus (vi) the cost of any useable production materials or components in inventory in excess, as to any type of item, of the estimated amounts which will be used during the three-year period beginning on the Closing Date (estimated on the basis of White's sales volume for the year ended August 31, 1980 (except hat, as to production materials or components for White's Autocar trucks, actual sales volume, annualized, shall be based upon the period from January 1, 1981 through June 30, 1981), adjusted to take account of effects of engineering changes or product changes in truck components and similar items), plus (vii) 100% of the cost of any non-saleable spare parts or non-useable production materials or components, minus (viii) the scrap or salvage value (determined by applying the historical relationship of scrap or salvage value to cost) of any non-saleable new or used trucks or spare truck parts, any non-useable production materials or components, and any saleable spare truck parts or useable production materials or components in excess of the quantities specified in clauses (v) and (vii), (b) the reserve for Legal Warranties, Government Recalls, White Policy Recalls, Individual Policy Adjustments and other recalls will be calculated as provided in Paragraph 3.03 and (c) the reserve for doubtful accounts will be determined in a manner consistent with that used in preparing the financial statements included in White's 1979 10-K, except that accounts receivable, if any, arising prior to September 4, 1980 will be reserved 100%.

5.02.  For the purposes of Paragraph 5.01:

(a)  A complete physical inventory of all Purchased Assets referred to in subparagraph (b) below will be taken as of the Closing Date or within seven days thereof except for spare truck parts located at the 79th Street Facility.  The 79th Street Facility will not receive any inventory after the Closing Date.  Within 120 days after the Closing Date Volvo shall, at its expense, to the extent directed by White, cause all inventory at the 79th Street Facility which White reasonably believes is not obsolete (under the standards of this Agreement) to be shipped to Additional Truck Facilities or other locations approved by Volvo and White. All shipments from the 79th Street Facility after the Closing Date will be (i) to Additional Truck Facilities or other locations approved by Volvo and White, (ii) recounted and verified at the receiving location, and (iii) added to the quantities of physicial inventory at the Closing Date.  120 days after the Closing Date representatives of White and Volvo will inspect the remaining spare truck parts inventory at the 79th Street Facility and will agree on the salvage value for such inventory and such amount shall be the net purchase price for such inventory.  In the event of the inability of Volvo and White to agree on such salvage value, Volvo shall abandon such remaining spare truck parts inventory to White, and such inventory so abandoned shall not be included in any computation of purchase price. No physical inventory of fixed assets will be taken.

(b)  In computing the value of inventories, including supplies, and the amount of the reserve for obsolescence relating to trucks, spare truck parts and production materials and components (i) the cost of new and used trucks and items historically categorized by White as "branch installa-

19

tions" will be historical cost, (ii) the cost of production materials, components and work in process will be current standard cost plus a factor representing freight-in on material, (iii) the value of spare truck parts will be based primarily on a percentage of net prices to dealers, which is intended to approximate cost on the first-in, first-out method, (iv) the value of supplies will be 80% of latest cost, and (v) the cost of returnable containers will be historical cost. The term "supplies" as used refers to materials, machine repair parts, small tools and similar items which (x) have been categorized by White as "nonproductive materials", (y) are not located on the production floor, and (z) historically have generally been expensed at the time of purchase.

These methods of calculating costs of trucks, branch installations, production materials, components and work in progress and the value of spare truck parts and supplies are, and are intended to be, the methods used by White Motor in preparing its financial statements included in White's 1979 10-K, except that the materials portion of current standard cost referred to in clause (ii) of subparagraph (b) and the current standard cost of supplies will be determined following the principle that all identical items will be valued at the cost incurred based on the latest pre-Closing Date vendor invoice, or if no invoice for a type of supply can be located, supplies of that type will be valued at zero.

(c)    The report of White's Accountants will state that (i) they have performed an examination of the Initial Closing Date Statement in accordance with generally accepted auditing standards, except that (x) no independent confirmation of accounts receivable has been made, and (y) no auditing procedures have been applied with respect to the effect, if any, on inventory valuation by application of the clause "to take account

20

of effects of engineering changes or product changes in spare truck parts, truck components and similar items" appearing in clauses (v) and (vi) of Paragraph 5.01, and (ii) in their opinion the Initial Closing Date Statement is presented fairly in accordance with the terms of this Agreement, except for the effects of such adjustments, if any, as might have been determined to be necessary had they performed the procedures excepted in clauses (x) and (y) above.

5.03.  During the period of 60 days after White delivers the initial Closing Date Statement to Volvo, Price Waterhouse & Company, or other accountants selected by Volvo and reasonably satisfactory to White, ("Volvo's Accountants") will review the Initial Closing Date Statement and the basis on which it was prepared.  During that 60 day period, White and White's Accountants will give Volvo and Volvo's Accountants access to White's accounting records and to the audit workpapers and other documents which were used in preparing and auditing the Initial Closing Date Statement, and the consolidated financial statements of White Motor and its subsidiaries for the year ended December 31, 1979, included in White's 1979 10-K , and White will cause its accounting personnel and White's Accountants to cooperate fully with Volvo and Volvo's Accountants in their review of the Initial Closing Date Statement.  Within 60 days after Volvo receives the Initial Closing Date Statement, Volvo will notify White in writing of any ways in which Volvo believes the Initial Closing Date Statement fails to comply with Paragraph 5.01 and should be changed.  If Volvo asserts there should be changes in the Initial Closing Date Statement, during the 15 days after the notice from Volvo, White, White's Accountants, Volvo and Volvo's Accountants will try to agree upon what, if any, changes should be made.  If they are not able to agree within 15 days upon what, if any, changes should be made, Arthur Young & Company,

or another firm of accountants agreed upon by White and Volvo, (the "Third Accountants") will be asked to review the Initial Closing Date Statement and Volvo's objections and White's responses to them, and the decison of the Third Accountants as to what, if any, changes should be made, will be binding upon both White and Volvo. The Third Accountants will for this purpose be treated as arbitrators. The statement of assets purchased and liabilities assumed to which Volvo does not object within 60 days, to which White and Volvo agree, or containing the changes recommended by the Third Accountants, is called the "Closing Date Statement" and all references in this agreement to items "shown on the Closing Date Statement" are to those items shown on the books of White as of the Closing Date, after all adjustments made in the preparation of the Closing Date Statement.

5.04. On a day designated by Volvo which is within 10 days after the Closing Date Statement is complete and delivered to Volvo,

(a)     Volvo will deliver to White, or White will deliver to Volvo, certified or bank cashier's checks drawn on a bank, or banks, which are members of the New York Clearing House Association, in an amount equal to the difference between the sum paid by Volvo in accordance with Paragraph 4.03(a) and the sum which is (i) one-third of the purchase price of the Purchased Assets, plus or minus (ii) the sum due from, or credit due to, Volvo, under Paragraph 3.02, plus (iii) the sum Volvo was required to pay White under Paragraph 13.01 and

(b)     Volvo and White will exchange the Temporary Note for a note (the "Note"), substantially in the form of Exhibit 5.04B, in a principal amount equal to two-thirds of the purchase price of the Purchased Assets, minus the amount, if any, by which the Temporary Note has been reduced by reason of Paragraph 2.04 or 2.05.

(c)    Volvo will deliver to White Motor, or White will deliver to Volvo, a certified or bank cashier's check drawn on a bank which is a member of the New York Clearing House Association, in an amount equal to the sum which is due to or from White so that (i) White will bear the cost of all real and personal property taxes and other governmental charges and impositions which are liens against or on the Purchased Assets on the Closing Date, or if not paid will subsequently become liens or encumbrances on the Purchased Assets notwithstanding their sale to Volvo, or for which Volvo may become liable, and all rent under leases related to Purchased Assets which must be paid to avoid the leases being terminated by the respective lessors, allocable to periods before 11:59 P.M. local time on the Closing Date, and Volvo will bear those costs allocable to periods after that time, and (ii) White will bear the cost of all prepaid real and personal property taxes and other governmental charges and impositions on the Purchased Assets and all prepaid utility costs related to real property included in the Purchased Assets allocable to periods before 11:59 P.M. local time on the Closing Date, and Volvo will bear those costs allocable to periods after that time. The taxes to which this paragraph relates will not include any income, franchise or other non-property taxes.

VI

## WARRANTIES AND REPRESENTATIONS OF WHITE

White warrants and represents to Volvo as follows:

6.01.   White Motor is a corporation duly organized, existing and in good

23

standing under the laws of the State of Ohio.  Gemini is a corporation duly organized, existing and in good standing under the laws of the State of Ohio.  WMI is a corporation duly organized, existing and in good standing under the laws of the State of Delaware.

6.02.  White Motor, Gemini and WMI each has full corporate power and corporate authority to execute this Agreement and carry out their respective aspects of the transaction contemplated by this Agreement.  This Agreement constitutes a valid and binding agreement of each of them, enforceable against each of them as to their respective obligations in accordance with its terms.

6.03.  Neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated by it, constitutes or will constitute a breach of, or default under, any agreement to which White Motor or any of its subsidiaries (including Gemini and WMI) is a party or by which any of them is bound, or violate any order of any court or government agency having jurisdiction over White Motor or any of its subsidiaries, except to the extent that (a) by reason of the White Chapter 11 Proceeding, White may lawfully execute and deliver this Agreement, and consummate the transaction contemplated by it, notwithstanding the fact that that may be a breach of, or default under, an agreement or violate an order of a court or a government agency, and (b) the existence of that breach, default or violation cannot give rise to any liability of Volvo or AB Volvo or affect any assets Volvo will be acquiring under this Agreement.

6.04.  By the time the court in the White Chapter 11 Proceeding issues the Order, that court will have been accurately informed of all material facts relating to this Agreement and the transaction contemplated by it, and there will be no basis for the Order to be challenged or dissolved by reason of White's failure to so inform the court.

24

6.05. Exhibit 6.05 is a complete list of all subsidiaries of White Motor, in addition to Gemini and WMI, which own or have any interest in any of the assets being purchased by Volvo under this Agreement. Each of those subsidiaries has authorized the sale of the assets being purchased by Volvo under this Agreement which that subsidiary owns or in which it has an interest, and each of them has empowered White Motor to, by executing this Agreement, bind the subsidiary to permit White to sell those assets to Volvo under this Agreement.

6.06. The consolidated balance sheet of White Motor and its subsidiaries at December 31, 1979 included in White's 1979 10-K was prepared in accordance with generally accepted accounting principles and presents fairly the consolidated financial condition of White Motor and its subsidiaries at the date to which that balance sheet relates.

6.07. White owns fee title to the New River Valley Property, free and clear of any liens or encumbrances, other than the liens and encumbrances listed on Exhibit 6.07. The New River Valley Property contains White's entire New River Valley production facility, and includes all real property White uses or plans to use as part of, or in connection with, that production facility and all other property at or near that production facility which is owned by White. By the Closing Date the New River Valley Property will not be subject to the liens and encumbrances shown as items (c) of Schedule B-Section 1 and 6 of Schedule B-Section 2 to Commitment No. R-42825 of Lawyers Title Insurance Corporation.

6.08. The Ogden Property contains White's entire Ogden production facility, all surrounding areas White uses or plans to use as part of, or in connection with, that production facility and all other property at or near that production facility which is owned by White or which White has the right to occupy. By the Closing Date, White will have made all payments which have become due and

25

payable under an agreement (the "Ogden Purchase Agreement") dated June 1, 1974 between Ogden City, Weber County, Utah and White Motor, proceeds of which are to be used to pay principal and interest with regard to the Ogden City, Weber County, Utah, Industrial Development Revenue Bonds, Series 1974, White Motor Corporation Project (the "Revenue Bond Indebtedness"). White is not in default in any manner other than failure to pay interest and taxes and commencement of the White Chapter 11 Proceeding under the Ogden Purchase Agreement or any other agreement relating to the Revenue Bond Indebtedness, and no officer of White has been notified of any action or planned action to terminate any of White's rights under the Ogden Purchase Agreement or to accelerate the Revenue Bond Indebtedness. White has the right to assign to Volvo all White's rights under the Ogden Purchase Agreement. The transaction contemplated by this Agreement will not create a right to terminate any of White's rights under the Ogden Purchase Agreement or to accelerate the Revenue Bond Indebtedness. No officer of White is aware of any assertion by the Internal Revenue Service that interest on the Revenue Bond Indebtedness is subject to the payment of Federal income taxes. White's interest in the Ogden Property is free and clear of any liens or encumbrances, other than liens and encumbrances listed on Exhibit 6.08. By the Closing Date, White's interest in the Ogden Property will not be subject to the liens and encumbrances shown as Items (c) and (d) on Schedule B-Section 1 to Commitment No. BB391616 of Lawyers Title Insurance Corporation.

6.09. The Orrville Leases are in full force and effect, and by the Closing Date White will have paid all rent required to be paid under the Orrville Leases, and White will be in full compliance with all the provisions of the Orrville Leases. White has not been informed by the sublessor under the Orrville Leases that the sublessor intends to attempt to terminate the Orrville Leases because White

26

commenced the White Chapter II Proceeding, or for any other reason.  There are no liens or encumbrances upon White's interest as sublessee under any of the Orrville Leases, except those shown on Exhibit 6.09.  Each Orrville Lease is superior to any liens or encumbrances on the property to which it relates, except those shown on Exhibit 6.09.  The property which is the subject of the Orrville Leases contains White's entire Orrville production facility, and includes all real property used or planned to be used by White as part of, or in connection with, that production facility which is owned or leased by White.  By the Closing Date, neither White's interest as sublessee under any of the Orrville Leases, nor the property to which they relate, will be subject to any of the liens or encumbrances shown as Items 22 through 26 (other than taxes for the year 1981) on Schedule B-Section 2 to Commitment No. BB621557 of Lawyers Title Insurance Corporation.

6.10.  Exhibit 6.10 is a complete list of all land and buildings owned by White which are used by White as part of, or in connection with, its branch distribution facilities, its spare parts depots or its regional offices, other than the 79th Street Facility.  White owns all that land and all those buildings free and clear of any liens or encumbrances, other than liens and encumbrances which do not adversely affect marketability of the title to that land and those buildings.

6.11.  Exhibit 6.11 is a complete list of all land and buildings leased by White and used as part of, or in connection with, its branch distribution facilities, its spare parts depots or its regional offices.  White will at the Closing Date have paid all rent required to be paid under each of those leases and White will be in full compliance with all the provisions of each of those leases, except that some of those leases make the commencement by White of the White Chapter II Proceeding an event of default.  No officer of White has been informed by any lessor under any of the leases listed on Exhibit 6.11 that the lessor intends to

attempt to terminate the lease because White commenced the White Chapter 11 Proceeding, or for any other reason.   There are no liens or encumbrances on White's interest as lessee   under any of the leases listed on Exhibit 6.11.

6.12.  The properties listed on Exhibit 6.10 and the properties which are the subject of the leases listed on Exhibit 6.11 are the only properties in which White has interests used by White as part of, or in connection with, any of its branch distribution facilities, its spare parts depots or its regional offices, other than the 79th Street Facility.

6.13.  Exhibit 6.13 is a complete list of all leases by which White leases equipment, tooling, computers or other personal property used by it in connection with the production, distribution or servicing of trucks or the maintenance of records or provision of information relating to those activities, except that Exhibit 6.13 may exclude leases of readily replaceable office equipment or other readily replaceable items which do not, as to any lease, require aggregate rent payments during its term (not including renewals at the lessee's option) in excess of $100,000 and which do not, as to all excluded leases, require aggregate rent payments during their respective terms (not including renewals at the lessee's option) and termination payments in excess of $1,000,000.

6.14.  Exhibit 6.14 is a complete list of all executory contracts and leases, other than dealer agreements and foreign distributor and foreign licensee agreements, not described in any other Exhibit, to which White is a party and which relate in any way to White's activities in producing, distributing and servicing trucks, except executory contracts and leases which do not, as to any contract or lease, have a term of more than three years or require aggregate payments (other than payments at the option of White or its successor) totalling more than $100,000, and do not, as to all excluded contracts and leases, require aggregate

28

payments (other than payments at the option of White or its successor) totalling more than $1,000,000.

6.15.   Except as shown on Exhibit 6.15, by the Closing Date White will have the right to assign to Volvo all White's rights under all the leases and contracts listed on Exhibits 6.11, 6.13, 6.14 and 6.23.

6.16   Exhibit 6.16 is a complete list of all security interests in Purchased Assets (other than real property or leases of real property to which Paragraph 6.07, 6.08, 6.09, 6.10 or 6.11 applies) and of the agreements under which they arise. At the Closing, Volvo will acquire those Purchased Assets and the Purchased Current Assets, free and clear of any liens or encumbrances, other than security interests listed on Exhibit 6.16 or mortgages or security interests described on other Exhibits to this Agreement.

6.17.   Exhibit 6.17 is a complete list of all employment contracts, other than collective bargaining agreements, relating to employees of White or of any other White Motor subsidiaries except WMCC.

6.18.   Exhibit 6.18 is a complete list of all collective bargaining agreements relating to employees at any of the Production Facilities and any branch distribution facilities or spare parts depots which are included in the Purchased Assets.

6.19.   Exhibit 6.19 is a complete list of all pension, profit sharing and other employee benefit plans adopted by the board of directors of White Motor or a subsidiary (including Gemini and WMI) in which employees of White Motor or any subsidiaries engaged in the production, distribution or servicing of trucks, other than WMCC, are participants.

6.20.   Except as shown in Exhibit 6.20, White has not promised any of its employees any salary increases (other than increases under collective bargaining

29

agreements listed on Exhibit 6.18 or cost-of-living or merit increases promised to salaried employees none of whom has a current salary of more than $40,000 per year), and White has not promised any of its employees that they will be given an opportunity to participate in any pension, profit sharing or other employee benefit plans of which they are not participants at the date of this Agreement.

6.21. Exhibit 6.21 is a complete list by type of policy of all liability insurance policies maintained by White, including, but not limited to, product liability insurance policies.

6.22. Exhibit 6.22 is a complete list of all trademarks, trade names, service marks, and franchises which are material to White in connection with the production, distribution or servicing of trucks. No officer of White has been notified of any claim by any person that in connection with the production, distribution or servicing of trucks White is violating any trademark, trade name, service mark or franchise, and no officer of White has been notified of any claim that White is not entitled to use any trademark, trade name, service mark or franchise listed in Exhibit 6.22.

6.23. Exhibit 6.23 is a complete list of all agreements to which White is a party relating to the manufacture or distribution by White of Western Star trucks.

6.24. Exhibit 6.24 is a complete list of all patents or licenses used by White in the production, distribution or servicing of trucks. No officer of White has been notified of any claim by any person that in connection with the production, distribution or servicing of trucks White is violating any patent or similar proprietary right owned by any other person, and no officer of White has been notified of any claim that White is not entitled to use any patent or other license listed on Exhibit 6.24 or that any of the patents listed on Exhibit 6.24 is not valid.

30

6.25. White is not a party to any litigation, nor has an officer of White Motor been notified of any threatened litigation, which will affect Volvo's title to, or right to use, any Purchased Assets or Purchased Current Assets, or to which Volvo or AB Volvo is likely to be made a party by reason of the transaction contemplated by this agreement.

6.26. On the Closing Date, the saleable New Truck Inventory will consist entirely of trucks (a) fit for sale, after normal dealer preparation, as new trucks and (b) which comply with the applicable requirements of the National Traffic and Motor Vehicle Safety Act and the Federal Motor Vehicle Safety Standards in effect on the Closing Date.

VII

WARRANTIES AND REPRESENTATIONS OF AB VOLVO

AB Volvo warrants and represents to White as follows:

7.01. AB Volvo is a corporation organized, existing and in good standing under the laws of the Kingdom of Sweden. At the Closing Date, Volvo will be a corporation duly organized, existing and in good standing under the laws of one of the forty-eight contiguous states of the United States of America.

7.02. This Agreement is a valid and binding agreement of AB Volvo, enforceable against AB Volvo in accordance with its terms. By the Closing Date, Volvo will have agreed to be bound by this Agreement and this Agreement will be a valid and binding agreement of Volvo, enforceable against Volvo in accordance with its terms.

7.03. Neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated by it, constitutes or will constitute a breach of, or default under, any agreement to which AB Volvo or any of its

31

subsidiaries is a party or by which any of them is bound, or violate any order of any court or government agency having jurisdiction over AB Volvo or any of its subsidiaries.

7.04. When issued, the Temporary Note and the Note will each constitute a valid and binding debt instrument of Volvo, enforceable against Volvo in accordance with its terms, and the guarantees by AB Volvo of the Temporary Note and of the Note will each be a valid and binding obligation of AB Volvo, enforceable against AB Volvo in accordance with its terms.

7.05. The consolidated balance sheet and income statement of the AB Volvo Group at December 31, 1980 and for the two years then ended contained in Volvo's Annual Report for 1980 were prepared in conformity with the Swedish Companies Act and give a fair view of the consolidated financial position of the AB Volvo Group at December 31, 1980. Since December 31, 1980 there has not been a material adverse change in the consolidated financial position of the AB Volvo Group or in the results of their operations as compared with the same period of the prior year.

7.06. By the Closing Date, AB Volvo will have all approvals of the Sveriges Riksbank, and any other approvals, required under Swedish law to permit AB Volvo to carry out its obligations under this Agreement and as guarantor of the Temporary Note and of the Note.

VIII

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF VOLVO AND AB VOLVO

The obligations of Volvo and AB Volvo at the Closing are subject to the following conditions, any of which may be waived by AB Volvo:

32

8.01. All the representations and warranties of White contained in Arti-
cle VI will be true and correct on the Closing Date with the same force and
effect as though made on the Closing Date, except to the extent changes are
expressly contemplated by this Agreement or the representations and warranties
relate to contracts, leases or property which Volvo has informed White Volvo does
not wish to acquire, and Volvo will receive a certificate, executed by the Chairman
of the Board of White Motor and dated the date of the Closing, to that effect.

8.02. White will have fulfilled all its obligations under this Agreement
required to be fulfilled at or prior to the Closing, including but not limited to,
its obligations under Articles X and XIII.

8.03. There will not have been any substantial destruction, by fire or
other casualty, of any material Purchased Assets, whether or not it is insured
against.

8.04. Volvo will have received a certificate from The Allen Group, Inc.
("Allen"), dated not earlier than ten days before the Closing Date, which states
that at the date of the certificate the Orrville Leases were in full force and
effect, White had fulfilled all its obligations as a sublessee under the Orrville
Leases and Allen had no right to terminate any of the Orrville Leases, except
that if White cannot obtain that certificate for Volvo without a payment to Allen
other than reimbursement for reasonable expenses, Volvo will have received a
certified copy of an order of the court in the White Chapter II Proceeding,
entered after a hearing of which Allen was given notice, that the Orrville Leases
are in full force and effect and that upon consummation of the transaction
contemplated by this Agreement, Allen will have no right to terminate any of the
Orrville Leases.

33

8.05.   Volvo will have received a certificate from Nella Properties, Inc., dated not earlier than ten days before the Closing Date, which states that at the date of the certificate the three leases dated August 1, 1977 from Nella Properties, Inc. to The Allen Group, Inc. and Nella Properties, Inc. were in full force and effect, The Allen Group, Inc. had fulfilled all its obligations as lessee under those three leases, and Nella Properties, Inc. had no right to terminate any of the three leases.

8.06.   The Order will have been issued and will unconditionally approve this Agreement and the transaction contemplated by it.

8.07.   Volvo will have received commitments from title insurance companies reasonably satisfactory to Volvo to issue policies, at Volvo's cost, in amounts and in form reasonably satisfactory to Volvo, insuring that the titles or interests Volvo will be acquiring under Paragraph 1.01(a) through (e) will be as represented in Paragraphs 6.07 through 6.11.

8.08.   Volvo will have received a certificate from an appropriate representative of the City of Ogden, Utah, dated not earlier than ten days before the Closing Date, which states that (a) at the date of the certificate White had made all payments it was required to make under the Ogden Purchase Agreement, (b) White is not in default in any manner under the Ogden Purchase Agreement, and (c) if Volvo assumes White's obligations under the Ogden Purchase Agreement, White may assign to Volvo White's rights under the Ogden Purchase Agreement.

8.09.   Volvo will have received a certificate from First Security Bank of Utah, N.A., as the indenture trustee under the Mortgage and Indenture of Trust dated June 1, 1974 (the "Indenture") relating to the Revenue Bond Indebtedness, dated not earlier than ten days before the Closing date, stating that all payments required to have been made under the Indenture have been made, and there is no other default under the Indenture.

34

8.10.   The court in the White Chapter 11 Proceeding will have entered orders with regard to all leases and contracts included in the Purchased Assets specified by Volvo by June 30, 1981 to the effect that (a) each of those leases and contracts has been assumed by White, and (b) White may assign each of those leases and contracts under Section 365(f)(2) of the United States Bankruptcy Code.

8.11.   White will have entered into new collective bargaining agreements approved by Volvo (which approval will not be unreasonably withheld or delayed) with (a) UAW Local No. 2069 relating to the New River Valley production facility and (b) IAM Lodge No. 46 relating to White's facilities at Forest Park, Georgia.

8.12.   Volvo will have received an opinion from Squire, Sanders & Dempsey, counsel to White, substantially in the form of Exhibit 8.08.

8.13.   There will not be any suit or administrative proceeding pending or threatened against Volvo or AB Volvo in the United States or in Sweden by any governmental agency or instrumentality, and there will not be any suit pending by any other person, seeking to enjoin Volvo from completing the transaction contemplated by this Agreement, seeking to penalize AB Volvo or Volvo, or obtain damages from either of them, for entering into that transaction, or seeking to cause Volvo to divest itself of the Purchased Assets or to cause AB Volvo to divest itself of Volvo.

8.14.   AB Volvo will have received any necessary permission from the Sveriges Riksbank to carry out, and cause Volvo to carry out, the transaction contemplated by this Agreement and to invest at least 700 million Swedish Kronor in Volvo (including sums invested or to be invested to enable Volvo to fulfill its obligations under this Agreement and under the Temporary Note and the Note), which permission may require AB Volvo to use funds obtained outside Sweden.

35

8.15.   The Closing Date will be no later than August 31, 1981.

IX

<u>CONDITIONS PRECEDENT TO THE OBLIGATIONS OF WHITE</u>

The obligations of White at the Closing are subject to the following conditions, any of which may be waived by White:

9.01.   All the representations and warranties of AB Volvo contained in Article VII will be true and correct on the Closing Date with the same force and effect as though made on the Closing Date, except to the extent changes are expressly contemplated by this Agreement, and White will receive a certificate, executed by a vice president of AB Volvo and dated the date of the Closing, to that effect.

9.02.   AB Volvo and Volvo will have fulfilled all their obligations under this Agreement required to be fulfilled at or prior to the Closing.

9.03.   The Order will have been issued and will unconditionally approve this Agreement and the transaction contemplated by it.

9.04.   White will have received an opinion from Rogers & Wells, counsel to Volvo and AB Volvo, substantially in the form of Exhibit 9.04.

9.05.   There will not be any suit or administrative proceeding pending or threatened against White in the United States or in Sweden by any governmental agency or instrumentality, and there will not be any suit pending by any other person, seeking to enjoin White from completing the transaction contemplated by this Agreement or seeking to penalize White, or obtain damages from White, for entering into that transaction.

9.06.   AB Volvo will have received any necessary permission from the

36

Sveriges Riksbank to carry out, and cause Volvo to carry out, the transaction contemplated by this Agreement.

9.07   Between the date of this Agreement and June 30, 1981, Volvo and WMCC will endeavor to reach an agreement under which after the Closing Date WMCC will extend credit to dealers designated by Volvo.  White will cause WMCC to endeavor to reach that agreement.

9.08.  The Closing Date will be not later than August 31, 1981.

X

COVENANTS OF WHITE MOTOR CORPORATION

10.01.   White will use its best efforts to cause all the conditions set forth in Article VIII to be fulfilled at or before the Closing.

10.02.   During the period between the date of this Agreement and the Closing Date, White will conduct its truck production, distribution and servicing activities (including, but not limited to, provision of warranty service) in the same manner in which they were conducted prior to the date of this Agreement, except to the extent that those activities are changed as part of the restructuring described in Paragraph 13.01 or with the prior written consent of Volvo or AB Volvo.

10.03.   White Motor will not, at any time after the Closing Date, engage, or permit any of its subsidiaries (including Gemini and WMI) to engage, in the production, distribution or servicing of trucks, except to the extent that limited distribution and servicing of trucks is a normal incident to the business of WMCC.

10.04.   Immediately following the Closing, White Motor will cause each of its subsidiaries which has the word "White" in its name, other than WMCC, to change its name so the word "White" no longer appears in its name.  White Motor

37

will use its best efforts to change its name as promptly as practicable after the Closing (which may be as late as the time of confirmation of a plan of reorganization in the White Chapter II Proceeding) so the word "White" no longer appears in its name. These efforts will, if necessary, include, but not be limited to, convening a meeting of its stockholders and recommending to them that they approve at that meeting an amendment to White Motor's Certificate of Incorporation changing its name.

10.05.    Between the date of this Agreement and such, if any, date as this Agreement terminates, neither White nor any officer or employee of White, nor anyone authorized to act on White's behalf, will, except as required to fulfill requirements of the United States Bankruptcy Code, engage in negotiations with anyone for the sale by White of any of the Purchased Assets to anyone other than Volvo.

10.06.    White will furnish all reasonable cooperation to AB Volvo and Volvo in connection with any filings required to be made by either or both of them under the United States Antitrust Improvements Act.

10.07    White will cooperate with, and assist, Volvo in taking all adminis-trative steps necessary to enable Volvo to establish pension plans for former White employees who become employees of Volvo.


XI

COVENANTS OF AB VOLVO AND VOLVO


11.01.    AB Volvo will use its best efforts to cause all the conditions set forth in Article IX to be fulfilled at or before the Closing.


38

11.02.   AB Volvo agrees to cause Volvo to be formed and guarantees the performance by Volvo of all of its obligations under this Agreement, including performance by it of all obligations to be performed by it after the Closing Date.

11.03.   AB Volvo and Volvo agree to furnish all reasonable cooperation to White and Gemini in connection with any filings required to be made by either or both of them under the United States Antitrust Improvements Act.

11.04.   If Volvo enters into an agreement with a current White dealer making that dealer a dealer of White trucks manufactured by Volvo (whether before, or within 1 year after, the Closing Date) Volvo will use its best efforts to cause that dealer to execute a document releasing White from any liabilities or obligations White might have to the dealer pursuant to the White Dealer Agreement (other than money owed for services rendered or other warranty costs) and/or because of the termination as of the Closing Date of the dealership agreement between White and the dealer or because of the transaction contemplated by this Agreement.   However, Volvo will not be required to make any payments for any of those releases.

11.05.   If the Purchased Current Assets include accounts receivable, until the Accounts Receivable Repurchase Date, Volvo will use all reasonable efforts to collect those accounts receivable and Volvo will report to White Motor in reasonable detail by account debtor at least monthly the results of Volvo's efforts to collect those accounts receivable, including names of account debtors who inform Volvo they do not intend to pay their accounts.

11.06   Volvo will take whatever reasonable steps are necessary (including furnishing reasonable indemnities) to retain a bank to act as Agent with regard to the Temporary Note and to the Note.

39

## XII

## ADDITIONAL AGREEMENTS OF WHITE

12.01.   If Volvo so requests, White will to the extent it has authority to do so (after, if necessary, making reasonable efforts to obtain landlords' consents, but without being required to make any payments for those consents) permit Volvo to occupy, for up to four months after the Closing Date, whichever one or more Volvo may designate of the following office, testing and computer facilities, for the rents shown below:

| Location of Facility | Rent per Month |
|---|---|
| Farmington Hills, Michigan | $44,845 |
| Southfield, Michigan (if not a Purchased Asset) | 13,352 |
| Wickliffe, Ohio (if not a Purchased Asset) | 12,500 |
| Libertyville, Illinois (if not a Purchased Asset) | 66,660 |
| Space in the 79th Street Facility for offices, and any other functions Volvo undertakes at that facility. | $0.65 per square foot as to office space $0.15 per square foot as to factory space |

White will not be required to permit Volvo to occupy the facility in Farmington Hills, Michigan if White sells its interest in that facility before the Closing Date, and if White does permit Volvo to occupy that facility, White may terminate that right at the end of any month on 30-days' prior notice to Volvo if White sells its interest in the facility.

40

12.02.   Volvo will not be required to remove the spare truck parts which are stored at the 79th Street Facility from that facility until one year after the Closing Date, except that if White sells or leases that facility, Volvo will move the spare truck parts in the facility to another location as promptly as practicable, and in any event within 60 days after White notifies Volvo that White has agreed to sell or lease the facility (but not before completion of the inspection contemplated by Paragraph 5.02(a)).

12.03.   If White sells any spare truck parts for their scrap or salvage value and retains any right to reacquire those spare truck parts, White will assign that reacquisition right to Volvo.

12.04.   White acknowledges that, because it will not be manufacturing trucks after the Closing Date, White will have no objection if (a) before or after the Closing Date, Volvo enters into dealer agreements with any or all current dealers of White, Autocar or Western Star trucks with regard to periods after the Closing Date, or (b) with regard to periods after the Closing Date, Volvo hires White employees who are engaged in activities at the Truck Production Facilities or at White's branch distribution facilities, parts depots (including the 79th Street Facility) or regional offices, who are otherwise engaged in the production, distribution or servicing of trucks (including employees who are engaged in engineering or other technical capacities), or who are engaged in executive, administrative, accounting or similar capacities, provided that employees of White who are hired by Volvo will be permitted to function for White on a part time basis, at White's expense, to perform whatever duties are required in connection with the resolution of the White Chapter 11 Proceeding.

41

XIII

RESTRUCTURING OF WHITE'S OPERATIONS

13.01.   White and AB Volvo have agreed to a program for restructuring White's truck production, distribution and servicing operations, which is anticipated to cost at least $8 million by the Closing Date.   Between the date of this Agreement and the Closing, White will proceed to implement that restructuring program.   White will consult with AB Volvo about White's progress in implementing the restructuring program and further steps White should take to implement the restructuring program.   At the time of the Closing, Volvo will reimburse White for the sums ("Approved Restructuring Costs") , up to a maximum of $8 million, spent by White or for which White has become obligated for relocation costs and other costs of implementing the restructuring program, including any modifications or extensions, which are approved by AB Volvo (which approval will not be withheld as to expenditures which are reasonable and are consistent with the restructuring program, including any modifications or extensions, to which AB Volvo has agreed). If AB Volvo does not fulfill its obligations under this Agreement and because of that there is no Closing, at the time the Closing would have taken place if AB Volvo had fulfilled its obligations under this Agreement, AB Volvo will reimburse White for its Approved Restructuring Costs, including costs of steps in progress at the time the Closing was to have taken place, up to a maximum reimbursement of $2 million.   The $2 million is not liquidated damages or a penalty, and is not in lieu of other remedies which White may have for breach by AB Volvo or Volvo of their obligations under provisions of this Agreement.


XIV

ADDITIONAL AGREEMENTS OF VOLVO

14.01.   If White is required under any agreement relating to financing

42

of wholesale or retail purchases of trucks sold by White to repurchase any of the trucks which were financed under that agreement, at the request of White Volvo will market those trucks for White, as White's sales agent, at any location specified by Volvo where Volvo is at the time selling similar trucks.  Volvo will attempt to sell the trucks, as White's sales agent, for not less than the minimum prices specified by White, and Volvo will retain (a) 5% of the sale price of each truck sold by Volvo as White's sales agent and (b) a sum equal to any sales taxes, transfer taxes, and out of pocket costs incurred by Volvo, in connection with sales of trucks by Volvo as White's sales agent.  White will execute all documents, and do all other things, which Volvo may reasonably request in connection with its efforts to sell trucks as White's sales agent.

14.02.   After the Closing Date Volvo shall, without cost to White, immediately upon learning of any occurrence which Volvo has reason to believe might give rise to a product liability claim against White:

(a)   Cause a prompt and full investigation of such occurrence to be made by personnel qualified to make such an investigation.

(b)   Evaluate whether a product fault was involved in such occurrence, and also evaluate whether any component purchased from a third party source contributed to such occurrence.

(c)   Build an investigatory file for the defense by Volvo and/or White of any product liability claim that might be brought against either of them thereafter relating to such occurrence, and an investigatory file for the assertion of any claims that might be brought by Volvo or White against component manufacturers with respect thereto.

(d)   If a product produced or sold by White prior to the Closing

43

Date was involved in such occurrence, promptly notify White of that fact, and of the occurrence.

(e)     At all times thereafter provide full cooperation to White in the defense of any claim that may be made against White relating thereto, or by White against any component supplier relating thereto, including as a part of such cooperation a full sharing of the information developed in the investigations undertaken by Volvo and full consultation services of engineering and testing personnel and facilities of Volvo.

14.03.    After the Closing Volvo will continue to perform the obligations of White in favor of TIC Investment Company with respect to computer services, use of software and data base, heretofore performed by White at the White facilities in Libertyville, Illinois, for the balance of the time period for which White is currently obligated under an agreement dated November 18, 1980 to provide such services.    The payments from TIC for the performance of such services shall be for the account of Volvo after the Closing Date.    Volvo agrees that, if so requested by WMCC, Volvo will enter into similar computer service arrangements (including similar compensation arrangements) with WMCC to provide services on and after the Closing Date, but Volvo shall have the right to terminate such continued provision of services to WMCC after the Closing Date by nine months advance written notice.    WMCC will make available to Volvo while Volvo is performing computer services for WMCC all computer and accounting systems and operating procedures owned by WMCC, on which WMCC has the right to use, which Volvo requires in order to perform the computer services for WMCC.  Nothing herein contained shall require that Volvo provide computer services from Libertyville, Illinois, as distinguished from another location of Volvo's choice.

44

XV

## INDEMNIFICATION

15.01.   White indemnifies Volvo and AB Volvo against, and agrees to hold each of them harmless from, all costs and liabilities (including, where applicable, reasonable attorneys' fees) related to any claims or liabilities by any employees or former employees of White (whether or not they become employees of Volvo), arising out of their employment relationship with White or the termination of that employment relationship, but not including any claim or liability based upon discrimination by Volvo in hiring or employment.

15.02.   If any claim of the type described in Paragraph 15.01 is made against Volvo or AB Volvo and Volvo or AB Volvo intends to seek indemnification from White relating to that claim, Volvo or AB Volvo, as the case may be, will promptly notify White of the claim. If White informs Volvo that White acknowledges it is obligated to indemnify Volvo or AB Volvo for any costs or liability with regard to a claim, and that White would like to defend that claim with counsel of White's choice, White will have the right to do that, and Volvo or AB Volvo, as the case may be, will cooperate fully in the defense of the claim.  If White elects to defend a claim with counsel of its choice, Volvo or AB Volvo may nonetheless have counsel of its choice participate in its defense of the claim, but Volvo or AB Volvo will not be entitled to be reimbursed by White for the costs of the additional counsel used by it.

XVI

## VOLVO'S RIGHT TO MATCH OFFERS

16.01.   If any firm or person offers to purchase all or a substantial portion of the Purchased Assets and the court in the White Chapter 11 Proceeding

45

determines that the transaction offered by that person is more beneficial to White than the transaction contemplated by this Agreement, White will notify Volvo of that fact and if within five days after the notice from White to Volvo, Volvo agrees to modify the terms of this Agreement so that Volvo will be purchasing the Purchased Assets on the terms offered by the other firm or person, White will recommend to the court in the White Chapter II Proceeding that it approve the sale to Volvo, and if that approval is obtained, will sell the Purchased Assets to Volvo on those terms and White will not accept the offer from the other firm or person.  If the other firm or person increases an offer after Volvo has offered to modify the terms of this Agreement so Volvo will be purchasing the Purchased Assets on terms previously offered by that firm or person, Volvo will have the same rights with regard to the increased offer that it had with regard to the earlier offer.  If an offer includes consideration which is not cash, Volvo will be deemed to have matched that offer if Volvo offers cash, or debt with a fair value, equal to the fair value of the non-cash consideration offered by the other firm or person.

<br>

XVII

## MISCELLANEOUS PROVISIONS

17.01.   Any reference in this Agreement to "production" of trucks will include the design, testing and manufacture of trucks, truck components and spare parts for trucks, the assembly of trucks and any other activities which are part of the process of producing trucks.  Any reference in this Agreement to "distribution" of trucks includes marketing, distribution to dealers and sale of trucks and spare truck parts, as well as any other activities which are normally part of the

46

process of distributing trucks or spare truck parts, but does not include activities related to financing the sale of trucks at wholesale or retail, and related activities which have been conducted by WMCC.

17.02.    The representations and warranties listed on Exhibit 17.02, and all the obligations of the parties to this Agreement which relate to periods after the Closing Date (including, but not limited to, the obligations of White under Article XV), will survive the Closing (as to representations and warranties, for the time periods specified in Exhibit 17.02). All other representations, warranties and obligations will be deemed satisfied and terminated by the Closing. In any event Volvo will not have the right to terminate this Agreement or assert any claim with respect to breach of any representation, warranty or covenant relating to any contract, lease or  property which Volvo informs White that Volvo does not wish to acquire.

17.03.    White represents and warrants to Volvo that the only firm which has acted as a broker or finder or in any similar capacity on behalf of White in connection with the transaction which is the subject of this Agreement is Lazard Freres & Co., which will be compensated by White.   AB Volvo represents and warrants to White that the only firm or person which has acted as a broker or finder or in any similar capacity on behalf of AB Volvo in connection with the transaction which is the subject of this Agreement is Merrill Lynch White Weld Capital Markets Group, which will be compensated by Volvo.   White and Volvo each indemnifies the other against, and agrees to hold the other harmless from, any costs or liabilities (including reasonable attorneys' fees) by reason of any claim for compensation for acting as a broker or finder or in any similar capacity on behalf of the indemnifying party in connection with the transaction which is the subject of this Agreement.

47

17.04.   Volvo and White will share equally (a) all transfer and similar taxes (but not filing or registration fees which are not taxes on transfer, or transfer or similar taxes outside the United States of America, all of which will be borne by Volvo) incurred as a direct result of the transaction contemplated by this Agreement, and (b) the costs of the Third Accountants.   Except with regard to those costs, or other costs expressly allocated by this Agreement, Volvo and White will each bear their own costs incurred in connection with this Agreement and the transaction contemplated by it.

17.05.   If at any time or times it is determined that the assets transferred to Volvo by White at the Closing are not all the Purchased Assets, (a) White will, at the request of Volvo, execute such deeds, bills of sale, documents of assignment and other documents as Volvo may reasonably request in order to transfer to Volvo the additional Purchased Assets specified by Volvo, and (b) if the additional Purchased Assets were not included on the Closing Date Statement, Volvo will deliver to White certified or bank cashiers checks in an amount equal to one-third of the purchase price of the additional Purchased Assets, and a note substantially similar to Exhibit 5.04B, (appropriately guaranteed by AB Volvo as contemplated by this Agreement) dated the date of the transfer of the additional Purchased Assets, in a principal amount equal to two-thirds of the purchase price of the additional Purchased Assets.

17.06.   This Agreement contains the entire agreement between AB Volvo and White, and supercedes (a) all prior agreements, understandings, representations or warranties, and (b) any contemporaneous agreements, understandings, representations and warranties which are not set forth in this Agreement (including the Exhibits to this Agreement) or in documents the delivery of which is contemplated by this Agreement.

48

17.07.   This Agreement may not be modified, except by a written document executed by AB Volvo and White Motor.  Gemini and WMI each agrees to be bound by any modification to this Agreement contained in a document which is executed by AB Volvo and White Motor and, if necessary, approved by the court in the White Chapter II Proceeding.

17.08.   This Agreement is for the benefit of AB Volvo, Volvo and White and their respective successors and assigns.

17.09.   Any notices or other communications required or permitted to be given under this Agreement must be in writing and will be deemed given on the day when delivered in person or given by telex promptly confirmed by an executed confirmation, or on the tenth business day after the day on which given by air mail, addressed as follows:

If to White:

White Motor Corporation
34500 Grand River Avenue
Farmington Hills, Michigan   48024

Attention:   Chairman of the Board

With a copy to:

White Motor Corporation
34500 Grand River Avenue
Farmington Hills, Michigan   48024

Attention:   Secretary

If to Volvo or AB Volvo:

AB Volvo
S-40508, Gothenburg, SWEDEN

Attention:   President, Volvo Truck Corporation

With a copy to:

Volvo of America Corporation
Rockleigh, New Jersey   07647

Attention:   General Counsel

or to such other addresses as the respective parties may subsequently designate in writing.

49